# Heath *versus* Page.

1. H. lent money to P. at usurious interest. After the usury was consummated, H., apprehending a suit from another creditor, conveyed land to G. without consideration, informing G. that he wished to put it out of the reach of the creditor. G., at the request of H., conveyed to J., the son of H., also without consideration. P. afterwards brought suit against H. for the excess of interest, recovered judgment and issued execution under which the land was levied on and condemned; afterwards J. conveyed to M. for a valuable consideration. *Held*, that the purchase-money received by J. from M. was attachable in J.'s hands under P.'s judgment.

2. The judgment of P. (aside from the fraud) was not a lien on H.'s land conveyed to J.

3. The land could not be reached at all, having passed to M., a bonâ fide purchaser for value, without notice of the fraud of H.: the execution not being against J., the grantor of M., and not lying in the path of M. in tracing J.'s title, because the conveyance of H. to G. was before the judgment of P., M. therefore would not be bound to look further than the judgment.

4. At the service of the attachment on J., the purchase-money from M. was in his hands, and alone represented the title of H. in the land.

5. Under the statute of 13 Elizabeth, as between the parties to a fraudulent conveyance, the title passes; but as to creditors it is treated as in the grantor.

6. The same principle applies to the proceeds of the grantor's estate when the title has passed to an innocent grantee.

7. Attachment-execution is an appropriate writ for the creditor in the case of a fraudulent sale of goods where the vendee has sold them.

8. A grantee who is a mere volunteer, and who has sold the land, so long as the money remains in his hands is on no better footing than the grantor.

9. Such grantee holds without consideration the money of the grantor, of which he is trustee *ex maleficio* for the creditors.

10. It is only when the property comes into the hands of a purchaser for a valuable consideration that it or its proceeds are protected by want of notice of the fraud.

11. The statute of 13 Elizabeth embraces all cases where the effect of a voluntary conveyance is to *hinder* and *delay* as well as to defraud creditors.

12. When a debtor denudes himself of all tangible property within the state, and leaves it, taking his choses in action, and leaving nothing to the process of his creditors, makes no provision for the payment of his debts and remains abroad without known residence, it is a case of hindrance and delay.

13. The levy, which was necessarily abandoned when J. sold to M., was not in the way of the attachment-execution.

14. It is only when the execution is inconsistent with the attachment that the attachment becomes irregular.

15. In questions of fraud much latitude of evidence is allowed: the test is whether the evidence can throw light on the transaction or whether it is totally irrelevant.

16. Excess of interest over 6 per cent. is the money of the borrower, which, when received by the lender, he cannot retain, but holds for the use of the borrower, and assumpsit will lie for it.

17. The right to recover the excess of interest has no cast of penalty.

18. Interest is but an incident of a debt, and when detached from the principal becomes itself a debt.

19. The Act of May 28th 1858 (Usury) detaches the excess of interest from the debt, and it is recoverable by the debtor in assumpsit.

20. As soon as a borrower's right to recover excess of interest accrues, he

[Heath *v.* Page.]

stands in the relation of creditor to the lender for money had and received to his use.

21. The statute of 13 Elizabeth extended to contingent liabilities, and would include *penalties* under the Usury Act of 1723.

November 3d 1869.    Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

Error to the District Court of *Allegheny county*: No. 13, to October and November Term 1869.

This was an attachment execution, John H. Page against Elijah Heath, in which John Heath was garnishee; it was issued to November Term 1866 on a judgment obtained June 27th 1864, on the verdict of jury, by Page against Elijah Heath, for $7400, and was served on the garnishee September 24th 1866.    Under this attachment the plaintiff claimed to have his execution satisfied out of purchase-money in the hands of John Heath of real estate which had belonged to Elijah Heath, which was conveyed through C. C. Gaskill to John Heath, who was Elijah's son, without a valuable consideration and was afterwards sold by him and conveyed to Gibson A. Mundorf for $14,750.    After this sale the plaintiff issued an execution; the land sold was levied on as the property of Elijah Heath and condemned, December 22d 1864.    The plaintiff proceeded no further on this execution and it was pending at the issuing of the attachment.    The defendant took a rule October 17th 1868 to show cause why the attachment should not be quashed; the rule was discharged October 19th.

On the trial, November 11th 1868, before Hampton, P. J., the plaintiff gave in evidence a suit by him against Elijah Heath commenced July 2d 1862, his declaration being in assumpsit for usurious interest, the cause of action was laid as having arisen February 1st 1862, and judgment June 27th 1864 for $7400, (see 12 Wright 130); also deed dated April 29th 1862, Elijah Heath to C. C. Gaskill, the consideration named being $7000, for real estate in East Birmingham and St. Clair; deed May 26th 1862, C. C. Gaskill to John Heath for the same real estate, the consideration named being $8000; it was conceded that there was no valuable consideration for either of these conveyances. Also deed December 26th 1864, John Heath to Gibson A. Mundorf for the same real estate for $14,750; this sum was paid by Mundorf to John Heath.    The plaintiff offered in evidence conveyances of other real estate made about the same time by Elijah Heath to Gaskill and by him to the wife of John Heath; and of Elijah Heath to John Heath, for the purpose of showing that Elijah Heath about that time was conveying his property to hinder, &c., his creditors.    The admission of the evidence was objected to by the garnishee, admitted by the court and a bill of exceptions sealed.    Plaintiff also offered in evidence a certificate from the clerk of the Circuit Court of the United States to show

that a suit had been brought in the spring of 1862 by the United States against Elijah Heath as surety of John Hastings, collector of Pittsburg, which suit was pending on the 17th day of October 1868, to be followed by proof that the conveyance by E. Heath to Gaskill was to hinder, &c., the United States with other cre- ditors.§ The evidence was objected to as not being the exemplification of the entire record, &c. The evidence was admitted and a bill of exceptions sealed. The plaintiff further offered to prove by W. O. Hughart, who had charge of the plaintiff's business in 1864, that he had made efforts about that time to find E. Heath or property from which to realize the judgment, that E. Heath had left the state, having parted with all his ostensible property, and witness had been unable to find his residence. The garnishee objected to the evidence; it was admitted and bill of exceptions sealed.

The witness testified that E. Heath had lived in the county, had left it and gone away; witness did not know the time when. Plaintiff, under objection and exception, gave evidence of the value of the real estate conveyed by Elijah Heath to Gaskill and John Heath. . Also certain of the answers of Gaskill to interrogatories under a commission to take his testimony issued by the garnishees. Gaskill in his answers testified that in April or May 1862 Elijah Heath conveyed to him thirty town lots in the borough of Birmingham, and in May or June following, witness, at the request of Elijah Heath, conveyed these lots to John Heath; that Elijah Heath was at that time expecting to be sued by the United States as surety of John Hastings, collector of the port of Pittsburg; Elijah Heath then told him that as the loss had occurred by Hastings having been robbed, he thought it was unjust and he did not intend to pay it if he could help it; that he lived 300 miles from Elijah Heath, but was intimate with him; witness's daughter was the wife of John Heath, and that Elijah, John and his wife, all lived together; witness's arrangement to accept the deed and convey to John Heath was made at E. Heath's house in Allegheny City; there was no money consideration. The plaintiff here rested.

The garnishee then gave evidence for the purpose of showing the pecuniary ability of Elijah Heath to pay all his debts after the conveyance of the land to Gaskill and John Heath. He also read the deposition of Gaskill, in which he testified that he supposed John Heath did not know anything that had occurred between witness and Elijah Heath. On cross-examination witness said that Elijah Heath lived in the upper part of New Jersey; that he did not know whether John Heath knew of the intended suit against his father; that John Heath never made any acknowledgment to witness for the deed; witness sent the deed to Mr. Keenan, at the request of Elijah Heath; witness at the time of

[Heath *v.* Page.]

the arrangement knew of no indebtedness of Elijah Heath to the plaintiff nor did he suspect any indebtedness of Elijah Heath.

The garnishee then gave in evidence a fieri facias in the District Court, John H. Page against Elijah Heath on the judgment of $7400, issued October 17th 1864; levy on the lands conveyed to Gaskill and by him to John Heath, being those in the inquisition and condemnation of December 22d 1864; also the declaration in the suit.

The plaintiff's points were:—

" 1. If the jury believe the deed from Elijah Heath to Gaskill was made and received with the intent to hinder, delay and defraud the United States government in the prosecution of its claims against Heath, as surety for John Hastings, on his official bond, such deed would be fraudulent and void as against all creditors of Heath, whose claims were then in existence.

" 2. The subsequent conveyance, by Gaskill to John Heath, without consideration, and in pursuance of the original fraudulent intent, would also be void as against such creditors.

" 3. The testimony of Gaskill, and all the attending circumstances, raise a strong presumption that John Heath was fully cognisant of the fraudulent intent with which the conveyance was made to him; but whether he was cognisant of the fraudulent intent or not, the conveyance to him being voluntary, he cannot hold either the land or the proceeds of its sale against the just claims of Elijah Heath's creditors, in existence at the time.

" 4. An attachment in execution will hold, in the hands of a garnishee, the proceeds of the sale by him of real estate which has been conveyed to him by a debtor, without consideration, for the purpose of hindering, delaying and defrauding his creditors.

" 5. If the jury find that the remedy of the plaintiff is or was hindered or delayed by the existence of the voluntary deeds from Elijah Heath to Gaskill, and from Gaskill to John Heath, and that plaintiff's debt existed at the time said deeds were made— then such deeds would be fraudulent and void in law as to the plaintiff, whether Heath was or was not solvent at the time, and whether John Heath was or was not a participant in the actual fraudulent intent.

" 6. A conveyance, fraudulent and void as to one creditor, by the statute 13 Eliz., is fraudulent and void as to all creditors and others having legal cause of action, *ex contractu*, at the time of such conveyance.

" 7. In order to sustain a voluntary deed against prior creditors, on the ground that the donor retained sufficient of his property to meet his present and anticipated liabilities, it must be shown that such property was ostensible, or such as the creditor could reach by the ordinary process of law, especially where the

[Heath *v.* Page.]

debtor had removed from the state before any of his creditors could obtain judgment on their claims.

"8. If the jury find the facts in this case to be as follows, viz. : that plaintiff's original claim, for which he afterwards obtained judgment, was in existence at the time of the delivery of the deed from Elijah Heath to Gaskill; that said deed was made and received without consideration, for the purpose of hindering, delaying and defrauding· the United States government in the prosecution of its claim against Heath, as surety for John Hastings, on his official bond ; that Gaskill, in pursuance of the agreement with Heath, immediately thereafter conveyed the land, without consideration, to John Heath, who, within six months after plaintiff had obtained his judgment against Elijah Heath, sold the land to Gibson A. Mundorf, receiving, as the consideration thereof, the sum of $14,750, the plaintiff is entitled to recover, and as the foregoing facts are in evidence, uncontradicted, the verdict should be for the plaintiff."

The defendant's points were :—

"1. To avoid a deed on the ground of fraud, it must be shown that both vendor and vendee participated in the fraud, or that the fraud of the vendor was known to the vendee, and in the absence of any such evidence, if the vendee should sell and convey the property to a third person, no creditor of the original vendor could have any claim upon the first vendee for the proceeds of such sale.

"2. As the plaintiff in this case, at the time of the conveyance from Gaskill to John Heath, was not a creditor of defendant, Elijah Heath, either by record, suit, claim, demand, or notice of intended claim, he stands in the relation of a subsequent creditor, and unless it appears affirmatively that there was an intention to defraud him, he has no right to assail the deed.

"3. The mere fact of indebtedness at the time of a father's making a voluntary deed to a son, does not render such conveyance fraudulent and void, if he had other property at the time sufficient, beyond a doubt, to pay his debts.

"4. At common law, A has no attachable estate in land paid for by him, but conveyed to B in order to secure it from A's creditors.

"5. A mortgagee of land has no attachable interest therein before entry to foreclose, or a release from the mortgagor, and in analogy to this well recognised principle, an attachment cannot reach the proceeds of a sale of the land by the garnishee, John Heath.

"6. The attaching creditor stands in the shoes of the defendant, and any equities that could have been set up against the latter, are equally available against the former.

[Heath *v.* Page.]

"7. The attaching creditor can acquire no claim against the garnishee superior to that of the debtor himself.

"8. A grantee in a voluntary deed does not become a trustee for creditors, because as to them the conveyance is void, and the land liable to their execution; and therefore the attachment in this case does not lie.

"9. A creditor, as such, has no right to challenge the validity of a voluntary deed. Until he has levied and sold the property, and become the sheriff's vendee, he has no right of any kind to interfere with the land.

"10. Under all the evidence of this case, there is no liability on part of defendant to plaintiff, and the case, as presented by the facts as proven, does not fall within the provisions of the Attachment Law of 16th of June 1836, and the verdict should be for the defendant.

"11. If John Heath had no knowledge of or participation in the alleged fraud, then having received the proceeds in good faith, he is entitled to hold them as against his father's creditors, more especially if, as he alleges, his father had property more than sufficient to pay and satisfy the plaintiff's judgment. If John Heath understood, when he received the deed, that it was a gift of the property to him, by his father-in-law, Charles C. Gaskill, and if he was wholly ignorant that it had been conveyed to Gaskill by his father, for the purpose of defrauding his creditors, he might sell, receive and retain the proceeds in good faith. If the land had remained in his possession, it might have been reached by the creditors of his father, under the statute of Elizabeth, even if he had not participated in the fraud, the conveyance being without consideration, but the proceeds of sale could not have been reached under that statute.

"12. The plaintiff having, on the 17th of October 1864, levied upon the Birmingham property, whilst the same was in the possession of John Heath, for this reason he cannot maintain this execution attachment."

The court affirmed the plaintiff's points from the 1st to the 7th inclusive, and as to the 8th said, "This point is sufficiently answered in the charge."

The defendant's points were answered as follows:—

"1. This point is sufficiently answered in the general charge.

"2. The facts assumed in this point are not sustained by the evidence, and, therefore, the court declines to answer it in the affirmative. The declaration, in the case of Page *v.* E. Heath, is in assumpsit, and lays the claim as far back as the 1st of February 1862, a period prior to the date of the deed. The suit was brought the 2d day of July 1862, a little over two months after the date of the deed. The recovery was had on that declara-

13 P. F. SMITH—8

[Heath *v.* Page.]

tion, and, therefore, it is to be presumed the claim extended back to a period prior at least to the date of the deed.

" 3. This point is affirmed in the general charge.

" 4 and 5. This proceeding is under our Act of Assembly, and not at common law. Without having time now to elaborate the question, whether the attachment in this case will lie, in case all the other questions should be decided in favor of the plaintiff, I will only say, at present, that I entertain no doubts on the subject. If the rule were that a man, in failing circumstances, might secretly and fraudulently convey all his property to a co-conspirator, for the purpose of cheating his creditors, and the next day, or the next hour, the grantee should convey the same to an innocent purchaser, for a full price, and then turn on the creditors, shake the money in their face and put them at defiance, I should despair of ever seeing many just debts collected in this, or any other country. A rule of this kind would open such a door to fraud as would utterly destroy all credit among business men.

" 6, 7, 8 and 9. We answer these points in brief, that if all the other questions are found for the plaintiff, the attachment will lie, and the verdict should be for the plaintiff.

" 10. We decline to charge as requested, in this point, but submit all the evidence to the jury, under the instructions contained in the general charge, and in our answers to the points."

Judge Hampton, after recapitulating the evidence, &c., charged : * * *

" From these various allegations, the following positions of the parties, respectively, may be stated, viz. : The plaintiff's counsel contends :

" 1st. That under the Statute of Elizabeth, for the prevention of frauds and perjuries, the deeds from Heath to Gaskill, and from him to John Heath, for the Birmingham property, are fraudulent and void as to the present plaintiff, because they were made by collusion with Gaskill and John Heath, with the fraudulent intent to hinder and delay the United States government and the plaintiff in the collection of their just claims.

" 2d. That, if they were not made, with such fraudulent design, they are, nevertheless, void as to the creditors of Elijah Heath, because they were made for a nominal, and without a valuable consideration, and that Elijah Heath, the grantor, not retaining sufficient ostensible property in his hands to pay his just debts, they were not good and valid as voluntary conveyances ; and, therefore, the plaintiff has a right to attach in the hands of John Heath, the money received from Mundorf, or so much thereof as may be necessary to satisfy his judgment.

" The defendant's counsel contend that the deed by Elijah Heath

[Heath *v.* Page.]

to Gaskill, and that by him to John Heath, were not fraudulent nor void as to the plaintiff, and that he is not entitled to have attachment in execution of the money received by him from Mundorf for the following reasons:

"1st. They deny that the conveyances were, or that they could have been, made for the purpose of hindering, delaying, or defrauding creditors of Elijah Heath; because, as they allege, the United States was not a creditor of and had no just claim on Elijah Heath, as the surety of John Hastings; and, because Elijah Heath, when he made the conveyance, was not aware of the claim of the plaintiff, and did not anticipate the bringing of any suit against him for the cause of action upon which the recovery was had.

"2d. They deny that John Heath had any notice or knowledge of the alleged fraudulent intent of Elijah Heath and Charles C. Gaskill, in making the conveyance of the East Birmingham property to him, but allege that he received the deed as a gift from his father, in good faith, and that he sold and conveyed the same, in good faith, to Mundorf, without any notice or knowledge of the alleged fraudulent intent on the part of the grantors; and, therefore, he is not liable to the plaintiff, or any one else, for the proceeds of the sale.

"3d. They deny that the conveyances, if voluntary, were void as to creditors; because, as they allege, the grantor retained in his hands a large amount of property and moneys, more than sufficient to meet and satisfy all his just debts and liabilities.

"1st. Was the deed of Elijah Heath to Gaskill, for the Birmingham property, and of Gaskill to John Heath, void as to the creditors of Elijah Heath? If it was made by collusion between the parties, with intent to hinder, delay or defraud the creditors of Elijah Heath, or any one of them, then said conveyance was fraudulent and void as to the said creditors, and did not pass any title to John Heath as against them. The intention with which this deed was made is a question of fact for your determination from all the evidence in the cause. If John Hastings, as has been contended, was not indebted to the United States, as collector for the port of Pittsburg, and if Elijah Heath was not liable, as his surety, it does not follow that the conveyance was not for the purpose of hindering and delaying the United States. If Elijah Heath supposed or believed that he was liable to the United States as one of the sureties of Hastings, and if he made the deed for the purpose and with the intent of defrauding the United States in the collection of the apprehended claim, and if John Heath, when he received this deed, was aware of such purpose and design, then that conveyance was fraudulent and void as to his creditors, although, in point of fact, he may not have been liable to the

[Heath *v.* Page.]

United States on Hastings' bond. And the plaintiff is entitled to avail himself of the fraud, in order to obtain satisfaction of his judgment out of the money now in the hands of John Heath, although Elijah Heath may not, at the time, have intended to hinder, delay or defraud John H. Page, the present plaintiff.

" In brief, it is clearly proved by the deposition of Charles C. Gaskill, read by both parties, and, of course, he is to be believed, that there was a combination between Elijah Heath and Charles C. Gaskill, to defraud the government of the United States, by the deed made by Heath to him, so that the only question for you to determine is, did John Heath know of that fraudulent intention, and did he, in furtherance of that design, receive the deed ? If you are satisfied that he did, you need not trouble yourself about any other questions in the cause ; the plaintiff will be entitled to recover in this proceeding, and your verdict will be in his favor.

" In determining this question, you will take into consideration the relation and situation of the parties, as they are disclosed by the evidence, and draw your own conclusions as to whether or not John Heath knew all about this transaction. And, as I said before, if he did, and participated in it by accepting the deed, you need not trouble yourselves about anything else in the case ; your verdict will be for the plaintiff for the amount of his judgment.

" But if you should find that he did not know and take part in this fraudulent transaction, you will next inquire whether Elijah Heath, after conveying away all the property covered by the various deeds in evidence, had an amount left abundantly sufficient to pay his just debts, including the judgment of the plaintiff, and was the property so situated, and of such a character as could readily be found, and made available for the payment of his debts ? It is conceded that John Heath has in his possession $14,750, the proceeds of the Birmingham property, conveyed through Gaskill to him, for which he never paid a dollar to his father, while the present plaintiff, John H. Page, has had a judgment in this court against his father, ever since June 1864, for $7400, and although diligent search has been made, as testified to by Hughart, to find property on which to levy in satisfaction of said judgment, no property can be found, notwithstanding Elijah Heath is supposed to be rich. But no witness has testified to any particular piece of property owned by him, anywhere. Now the rule of law is well settled, that a father may make a gift of land, or other property, to a child, if it be not done to hinder, delay or defraud creditors ; provided, he has other ostensible property, amply sufficient to satisfy all his just debts. But that property must be such, and so situated, that it can be reached by his creditors without great trouble and extraordinary efforts. But a creditor is not bound to follow a debtor to England, or California, or to any other state,

[Heath v. Page.]

in order to search for property on which to levy in satisfaction of his claim, if the debtor had an abundance in this state to pay all his debts, and when about to be pushed makes a gift of it to his son, and then leaves the country. This would be unjust and unreasonable. Rather let the creditor's just claims be first satisfied out of the property within their reach, and let the son receive the father's beneficence elsewhere.

"You will apply this rule of law to the present case, according to the testimony of Mr. Hughart, which is uncontradicted. No property of Elijah Heath was found anywhere, after the most diligent search and inquiry. True, it is said by Gaskill, that he believed him to be worth some sixty thousand dollars, after all the conveyances were made. But whether in real or personal estate, or where situated, he does not say. This kind of evidence fails entirely to satisfy my mind, that Elijah Heath has enough property anywhere to pay and satisfy his debts, besides the property conveyed by the deeds in evidence. But whether this be so or not, you must deduce from all the evidence before you, and if you find that he has not sufficient property, which can be reached by legal process, then your verdict will be for the plaintiff for the amount of his judgment, with interest and costs.

"But another question is raised by the 3d, 4th, and 6th points presented by the plaintiff's counsel, and that is, even although John Heath was not cognisant of, and did not participate in, the fraudulent arrangement entered into between Elijah Heath and Charles C. Gaskill, and although Elijah Heath had property besides that conveyed, sufficient to pay all his debts, yet if he made the deed for this Birmingham property, without receiving any valuable consideration therefor, for the purpose of hindering, delaying or defrauding his creditors, and if such conveyance did hinder or delay the collection of the plaintiff's claim, in either case the conveyance would be fraudulent and void, and the plaintiff would be entitled to recover.

"Now, as we have before instructed you, in order to avoid the deed on the ground of actual fraud, it was necessary that John Heath should have known of the fraudulent intent of his father, and assented thereto by accepting the conveyance. But if he had no such knowledge or notice, and had paid a valuable, that is, a full and fair money consideration for the land, he would be protected, because he had honestly and innocently purchased and paid full value, without any fault on his part. And in such a case equity would come in to protect him. But I apprehend the rule would be different when the vendee is a mere volunteer, who has no equity to be protected. He is the innocent recipient, it is true, of the legal title, but he has paid nothing for it, and the conveyance was made with a fraudulent intent on the part of the grantor, and that conveyance, so made, actually did hinder, delay and pre-

[Heath *v.* Page.]

vent the honest creditor from collecting his just claim. In such a case the equities are all on the side of the honest creditor, whose interests must be protected, while the grantee, who has no equitable interest, must be postponed.

" If this rule be correct, and I believe it is, as at present advised, without sufficient time to examine it thoroughly, it must, without reference to the other questions heretofore discussed, decide this case in favor of the plaintiff. And we now instruct you that, if Elijah Heath conveyed this land to Gaskill, and he to John Heath without any pecuniary consideration being paid, for the purpose, and with the intent to hinder, delay and defraud his creditors, and if such conveyance did hinder and delay the plaintiff in the collection of his judgment, then the plaintiff is entitled to your verdict.

" The amount of the foregoing ruling is as follows :—

"1st. If John Heath knew, or ought to have known, of the intended fraud concocted between his father and Gaskill, when the deed was received by him, then the plaintiff is entitled to your verdict.

" 2d. If Elijah Heath made the deed to Gaskill, and he to John Heath, as a gift from his father, and if he did not own other ostensible property which could be reached by the use of reasonable exertions, sufficient to pay the plaintiff's judgment, then the plaintiff is entitled to recover. But if he owned other property sufficient to pay the plaintiff's claim, which could be reached by the usual and ordinary course of legal proceedings, then so far as this branch of the case is concerned, the plaintiff would not be entitled to recover.

" 3d. If the deed was made from Elijah Heath to his son John, through Gaskill, without any pecuniary consideration, for the purpose of hindering, delaying and defrauding his creditors, and if such conveyance did hinder, delay or prevent the plaintiff from obtaining satisfaction of his claim, then the plaintiff is entitled to your verdict, whether John Heath knew of his father's intention or not."

The verdict was for the plaintiff for $9346, and that the garnishee had in his hands sufficient to satisfy the same.

The garnishee took a writ of error. The first four assignments of error related to the rulings as to evidence; the 20th was that the court did not quash the attachment execution; the remainder related to the answers to the points and to the charge.

*S. A. Purviance* and *B. F. Lucas* (with whom were *A. G. Lucas* and *W. S. Purviance*), for the plaintiff in error.—Either the attachment or the fi. fa. might be set aside at the election of the defendant: Grant *v.* Potts, 2 Miles 164; Tams *v.* Wardle, 5 W. & S. 222. The declarations of Gaskill, the grantor, were not evi-

dence to impeach the title of his grantee: Postens v. Postens, 3 W. & S. 127; Scott v. Heilager, 2 Harris 238; Magniac v. Thompson, Baldwin 344. As to the necessity of a vendee participating in the fraud to avoid the deed: McKee v. Gilchrist, 3 Watts 232; Ashmead v. Hean, 1 Harris 584; Dean v. Connelly, 6 Barr 249; Drum v. Painter, 3 Casey 150; Reichart v. Castator, 5 Binney 105; Tonor v. Barrington, Brightly 253; Swinton v. Swinton, 1 Dane's Ab. 628; Adams v. Adams, Id.; Foster v. Hall, 12 Pickering 89; Phillips' Academy, 12 Mass. R. 456; Bridges v. Eggleston, 14 Id. 250; Huston v. Wickersham, 8 Watts 523. The deed was not void as against Page: Byrod's Appeal, 7 Casey 241; Hinde v. Longworth, 11 Wheat. 199; 3 Sumner 429; Gibson v. N. American Land Co., Peters' C. C. R. 460. Elijah Heath having reserved enough to pay all his debts, his deed was not void, although voluntary: Mateer v. Hissim, 3 Penna. R. 166; Posten v. Posten, 4 Wh. 27; Miller v. Pearce, 6 W. & S. 101; Chambers v. Spencer, 5 Watts 404. Elijah Heath had no attachable interest in the proceeds of the land as sold to Mundorf: How v. Bishop, 3 Metcalf 26; Portland Bank v. Hall, 13 Mass. R. 207; Blanchard v. Colburn, 16 Id. 345; Ripley v. Severance, 6 Pickering 474. Having levied on the land the attachment cannot hold: Act of June 16th, 1836, § 35, Pamph. L. 767, Purd. 435, pl. 30. An attaching creditor stands in the shoes of the debtor: Reed v. Porter, 2 Grant 472; Riddle v. Etting, 8 Casey 412; Patten v. Wilson, 10 Id. 299; Strong v. Bass, 11 Id. 334; Myers v. Baltzell, 1 Wright 493; Fessler v. Ellis, 4 Id. 249.

*H. Burgwin*, for defendant in error.—A docket entry is sufficient to prove the pendency of a suit: Phila. W. & Balt. R. R. v. Howard, 13 Howard R. 307:—it was for that purpose the certificate of the Circuit Court was offered. The pendency of a fi. fa. is not a bar to an attachment execution: Coleman v. Mansfield, 1 Miles 56; Tams v. Wardle, 5 W. & S. 222; Davies v. Scott, 2 Miles 52; Newlin v. Scott, 2 Casey 102; Kase v. Kase, 10 Id. 128; Pontius v. Nesbit, 4 Wright 309. The parts of Gaskill's deposition were properly admitted: Calhoun v. Hays, 8 W. & S. 127. As to what is a fraudulent conveyance: Preston v. Jones, 14 Wright 54; Spiritt v. Willow, 11 Jurist N. S. 70. The rule that an attaching creditor is in the place of the debtor does not apply when there is fraud: French v. Bridleman, 2 Grant 319; Driesbach v. Becker, 10 Casey 152; King v. Faber, 1 P. F. Smith 387.

The opinion of the court was delivered, January 3d 1870, by

AGNEW, J.—The numerous assignments of error to the charge and answers of the court to points, will be resolved by the disposi-

[Heath *v.* Page.]

tion we shall make of a few principal questions. This was an execution attachment against John Heath, as garnishee, under the following circumstances.

Elijah Heath had lent money to John H. Page, at usurious interest. The deed from John H. Page to Elijah Heath, for property accepted by Heath in payment of the debt, and by which the usury was consummated, bears date *December* 13*th* 1861, and was acknowledged December 31st 1861. In Heath *v.* Page, 12 Wright 145, it was held, however, that the usury was not complete until the 14*th day of April* 1862, when satisfaction was entered on the mortgage given to secure the debt. On the 2d of July 1862, Page sued Heath for the excess of interest paid him, and recovered judgment June 27th 1864. The declaration was in *indebitatus assumpsit*, and laid the time when the debt accrued for the excess of interest as of the 1*st of February* 1862. Elijah Heath conveyed the property from which the money attached in the hands of John Heath arose, to Charles Gaskill, by deed dated 29th of April 1862, reciting a consideration of $7000. Gaskill and wife conveyed the same property to John Heath, the garnishee, by deed dated May 26th 1862, reciting a consideration of $8000. It is conceded that both these deeds were purely voluntary, no money being paid by either grantee. John Heath sold and conveyed the property to Gibson A. Mundorf, a bonâ fide purchaser, without notice of any fraud, by deed dated December 26th 1864, for the sum of $14,750 paid in full to Heath. This is the money attached in the hands of John Heath. Then, whether we take the date of Page's deed to Elijah Heath, in payment of his mortgage, the date laid in the declaration in the suit for the excess of interest, or the date of the satisfaction of the mortgage of Page to Heath, the usury was complete before the 29th of April 1862, the date of E. Heath's deed to Gaskill, and Page's right to recover the excess had already vested. Page, therefore, was an existing creditor to be affected by Heath's deed to Gaskill, unless his claim for the excess of interest is not a debt, and he not a creditor, within the protection of the statute of 13 Elizabeth. This then is the first question.

For one hundred and thirty-five years the legislation of the state, on the subject of interest, viewed usury as a crime, and denounced upon it, a forfeiture of the money lent, as its punishment. That which was recoverable under the Act of 1723, for usury, was a penalty, half of which went to the government, and half to any informer who should sue for it. But with the changes wrought in the commerce, and in the ideas of the people, came a change in their legislation; and in 1858 the lawful rate of interest in all cases where no express contract should be made at a less rate, was established at *six per centum per annum*. When a greater rate is bargained for, no penalty is exacted, but the bor-

rower or debtor is not bound to pay the excess, and may retain or deduct it from the debt, or having paid it, may recover it back at any time within six months after the payment. Thus the excess of interest over six per cent. is evidently the money of the borrower, which, when received by the creditor, he cannot retain, but holds for the use of the debtor, and for which an action of assumpsit lies. It has no cast of a penalty. Hence, in answer to an objection that the action should have been in debt and not in case, this court, through Woodward, C. J., in Heath v. Page, 12 Wright 146, said that "the action is *not for a statutory penalty*, but is to recover back an *excess of interest*, voluntarily paid upon a usurious contract." Interest, in its very nature, is but an incident of a debt, and therefore partakes of its kind; and when detached from the principal becomes itself a debt. It was upon this inherent quality as a debt, this court held that coupons for interest bear interest: Beaver County v. Armstrong, 8 Wright 63. The law of interest under the Act of 1858, now detaches the excess of the interest from the debt of which it was a part, and returns it to the debtor as his own; and it is therefore recoverable in *assumpsit*, as we held in Heath v. Page. At the instant, therefore, that Page's right of action accrued to recover the excess, he stood in the relation of a creditor to Heath for so much money had and received by the latter to his use.

But independently of this reasoning, on authority the claim falls within the letter and spirit of the statute of 13 Elizabeth. The statute makes "utterly void, frustrate, and of none effect," all conveyances and other recited instruments and acts, "as against that *person or persons*, his or their heirs, successors, executors, administrators and assigns, and every of them, whose *actions, suits, debts, accounts, damages, penalties, forfeitures*, heriots, mortuaries and reliefs, by such guileful, covinous, or fraudulent devices and practices, as is aforesaid, are, shall or might be in any way disturbed, hindered, delayed or defrauded:" Roberts' Digest 296. It was, therefore, said in Twyne's Case, 1 Smith's Lead. Cases, p. 5, "that this act doth *not* extend *only* to *creditors*, but to all who had cause of action, suit, or *penalty, forfeiture, &c.*" "And it was resolved that this word forfeiture should not be intended only of a forfeiture of an obligation, recognisance or such like (as it was objected that it should, in respect that it comes after damage and penalties), but also to everything which shall by law be forfeit to the king or subject." This would include the penalties under the Usury Act of 1723. In Shontz v. Brown, 3 Casey 131, Woodward, J., said, that the question is not to be answered by a sharp definition of the word "creditors," as the statute avoids conveyances made to defraud creditors and *others*. He remarked, also, that the statute extends to *contingent* liabili-

[Heath *v.* Page.]

ties, and thought it would protect a plaintiff in an action for *scandal,* or on a *contract of marriage.*

Now as we have seen that Page's right of action arose not later than the 14th of April 1862, and before Heath's deed to Gaskill of the 29th of April 1862, he stood protected by the statute of 13 Elizabeth. This relieves the case of numerous assignments of error and authorities.

We come now to the second principal question in the cause, to wit, the nature and attachable character of the money in the hands of John Heath. It is urged that the property having come to him through Charles Gaskill as *land,* and the money being the proceeds of his *own* sale to Mundorf, the fund is not a debt due to Elijah Heath, and is not attachable. In solving this question it is to be noticed first, that the judgment of Page *v.* Heath entered on the 27th of June 1864, was not a lien (aside from the fraud) on the land conveyed by Heath to Gaskill, in April 1862. The land, therefore, can be followed only on the ground of fraud in the conveyance. It is to be observed, in the second place, that the land itself cannot be reached at all, it having passed into the hands of Mundorf, a bonâ fide purchaser for value, without notice of the fraud, on the 26th of December 1864. The fi. fa. levied in October 1864, was not against John Heath, and therefore did not lie in the path of Mundorf in tracing the title of John Heath; for when he would arrive at the deed from Elijah Heath to Gaskill he would find it prior to the judgment of Page, and there-fore, unless he had notice of the fraud, he would be bound to look no farther than the judgment. As the case stood at the service of the attachment, John Heath held the proceeds of the sale to Mundorf, which alone can represent the title that Elijah Heath had in the premises; and if, by reason of the fraudulent convey-ance, and the subsequent conversion of the land into money, by a sale to a bonâ fide purchaser, the money cannot be followed, the creditors of Elijah Heath are baulked by the fraud, and the statute of 13 Elizabeth rendered abortive. But this is a con-sequence not to be tolerated, while the only fund representing Elijah's interest remains in the hands of a mere volunteer who has paid no consideration; and this we rule on both principle and authority. The objection that there is no privity between Elijah and John Heath, to constitute the relation of creditor and debtor, is answered by the reasoning of Chief Justice Gibson, in Engle-bert *v.* Blanjot, 2 Wharton 245; "What then," says he, "is the interest of a debtor in property fraudulently conveyed by him? As regards benefit to himself, absolutely nothing; but as regards benefit to those attempted to be defrauded, something tangible and substantial. For the benefit of these the ownership remains in him as a trustee *ex maleficio.* On no other principle could the legal title be sold, even on judicial process against him; yet it is

[Heath v. Page.]

constantly seized in execution as his and sold as his. The title remains in him so far as is necessary to protect the interest of his creditors." The same doctrine is re-asserted in Moncure v. Hanson, 3 Harris 391 and 395. This is the necessary effect of the statute of 13 Elizabeth, which avoids the fraudulent conveyance as to creditors only. As between the parties the title passes, but the law arrests it in favor of creditors, and treats the title as still in the grantor. In order to effectuate the statute, the same principle must reach the proceeds representing the grantor's estate, when the title has passed into the hands of an innocent grantee, from whom it cannot be recalled; and for this we have authority. The same principle has been applied, in many cases, where the debtor had made an assignment for the benefit of creditors and the deed became void as to creditors generally, by reason of its not being recorded within thirty days under the Act of 1818. In these cases, both foreign and execution attachments were supported against the assignee in favor of creditors : Flanagin v. Wetherill, 5 Wharton 280; Stewart v. McMinn, 5 W. & S. 100; Wharton v. Grant, 5 Barr 39; Watson v. Bagaley, 2 Jones 164; Mitchell v. Stiles, 1 Harris 306; Hennessy v. Western Bank, 6 W. & S. 301; Raiguel & Co. v. McConnell, 1 Casey 362; Driesbach v. Becker, 10 Casey 152; Gerlach v. Coates, 8 Wright 43. The principle of these cases cannot be distinguished from the present. The Act of 1818 made the unrecorded deed void as to the creditors only, while as between the parties to it, the conveyance is good, and no contract can be implied on the part of the assignee to refund the proceeds of his sales, except for the surplus remaining after the execution of the trust. The cases cited are too numerous, and the doctrine too well settled, that attachment execution will lie in behalf of the creditor, to be now overthrown on the ground that there is no actual contract to restore the proceeds of sale. The remarks of Sergeant, J., in Stewart v. McMinn, supra, are directly in point: "Although the assignment is null and void against creditors, yet it is good as between the assignor and assignees; the assignor, therefore, not being able to demand the funds, they are not, it is contended, a debt due to him. If we are bound down to the rigid letter of the act, this position may, perhaps, be true. But we think we must look at the spirit of the act giving the attachment, and endeavor to effectuate its design and object; and these were to enable creditors to reach funds belonging to the debtor which could not be seized on a fi. fa., but were in the hands of a third person, such as debts and other choses in action, goods pawned, &c., and that for the benefit of the creditors, and to give them a remedy, the funds in hand or uncollected may be considered as debts due to the assignor. Indeed, if it were not so, the creditors would not be able to reach them, and the assignment would, so far,

be rendered valid as to creditors, notwithstanding the express enactment of the law to the contrary." These decisions bring us fairly up to the present question and to the cases directly in point. In Mench *v.* Beidelman, 2 Grant 319, the attachment execution is held to be an appropriate writ for the creditor in the case of a fraudulent sale of store goods, where the fraudulent vendee has sold part and has part in hand. "It is certainly true, (said Lowrie, J.), that the money received by him (the vendee) for the part sold is not legally a debt due by him to the fraudulent vendor; for the law will not help to enforce the fraud; but in the intention of the parties it is a debt, and the creditors may treat it as such and attach it, and so we decided last year at Philadelphia in the case of Tams *v.* Tams; and there have been previous decisions going in the same direction." As there is no difference in principle and reason, between the proceeds of the sale of goods, and of lands fraudulently conveyed, so there is none in authority, as the following cases prove. In Mitchell *v.* Stiles, 1 Harris 306, the debtor conveyed his *real* estate under a deed of trust to sell it and pay the proceeds according to his written appointment, and execution attachment was levied of the proceeds of sales in the hands of the trustee. Still more to the point is Coates *v.* Gerlach, 8 Wright 43, where the execution attachment was held to lie against the proceeds of real estate in the hands of a bonâ fide purchaser, who had not paid over the money, after a voluntary conveyance by a husband to his wife, and a sale by the wife to the purchaser, in whose hands the attachment was laid. These same cases also prove the secondary position that a grantee who is a mere volunteer, so long as the money remains in his hands, stands on no better footing than the grantor. He holds without consideration the money of the grantor, of which he is deemed to be a trustee *ex maleficio,* for his creditors. The beneficent and remedial provisions of the statute of 13 Elizabeth would be of little avail if a fraudulent grantee could pass the property over to a mere volunteer without notice of the fraud, and then claim on that ground that it or its proceeds were safe from the pursuit of creditors. It is only when the property comes into the hands of a purchaser who has paid a valuable consideration for it, it or its proceeds are protected by a want of notice of the fraud: Rogers *v.* Hall, 4 Watts 359; Hood *v.* Fahnestock, 8 Watts 489.

The errors assigned to those portions of the charge which relate to the proportion of the property retained by Elijah Heath, when he conveyed the property in question to Charles Gaskill, are of but little importance, as this was, according to the testimony, a case of positive fraud. But we may say in reference to these errors, that the statute of 13 Elizabeth embraces all cases where the effect of a voluntary conveyance is to *hinder* and *delay,* as well as to defraud creditors. Hence, where a debtor denudes

[Heath *v.* Page.]

himself of all tangible property within the state, and then leaves it, carrying with him all his choses in action, and leaving nothing to the process of his creditors, makes no provision for the payment of his debts, and remains abroad without known residence, it is a case of hindrance and delay, and seriously embarrasses the creditors in their remedy, and falls within the statute. Such were the facts upon which the instruction of the court was given, and we see no error in it. The objection that the court submitted the question of John Heath's knowledge of the voluntary character of his father's deed to Charles Gaskill without evidence, has no just foundation. Elijah Heath, John Heath and his wife, who is a daughter of Gaskill, lived together in the same house in Allegheny City, while Gaskill was distant from them from three hundred to four hundred miles. The agreement between Elijah Heath and Gaskill for the transfer of the property to avoid the payment of the bond to the United States, was made at Heath's, in Allegheny City. John Heath received two deeds from Gaskill, one for the property in question, the other for the Allegheny City property. From the nature of the circumstances, as well as from the deed itself, John Heath knew that the property conveyed by Gaskill was his father's property. He must have known also the notorious fact of his father's liability for Hastings, and the robbery of the latter; and Gaskill says, John probably knew of the intended suit by the United States. It is admitted John paid Gaskill nothing. The deeds came through Keenan to him. He never acknowledged their receipt, or thanked his father-in-law for his gift, and, most strange of all, no communication ever passed between Gaskill and John, or his wife, on the subject. Gaskill says they never conversed on the subject, and that he simply made the deed to John, because he was so directed by Elijah Heath. John sold the property in question for $14,750. The idea, therefore, that all this took place without John's knowledge of his father's purpose, and without a word's conversation with Gaskill, on the presumption of a bonâ fide transaction on the part of John, is too preposterous to be believed. But on the supposition of John's previous knowledge of his father's purpose, it is easily believed. Then it would be his policy to have no correspondence with Gaskill, that he might appear to be without knowledge.

The prior levy, which was necessarily abandoned by reason of John Heath's sale to a bonâ fide purchaser for value, was not in the way of the execution attachment. It is only when the execution or other final process is inconsistent with the attachment, that the latter becomes irregular: Tams *v.* Wardle, 5 W. & S. 222; Coleman *v.* Mansfield, 1 Miles 56; Newlin *v.* Scott, 2 Casey 102; Kase *v.* Kase, 10 Casey 128; Pontius *v.* Nesbit, 4 Wright 309.

There was no error in receiving the deed made by Elijah Heath

[Heath *v.* Page.]

on the 24th of April 1864, for the purpose of showing the fraudulent intent of the deed made on the 29th of April. In cases of fraud much latitude in the evidence is allowed. The only true test is, whether the evidence can throw light on the transaction, or whether it is totally irrelevant: Zerbe *v.* Miller, 4 Harris 495; Covanhovan *v.* Hart, 9 Harris 495; Kaine *v.* Weigley, 10 Harris 183.

It was error to receive the certificate of the clerk of the Circuit Court, and copy of the docket entries in the case of the United States *v.* Hastings and his sureties. But it did the defendant no injury. The paper showed nothing but a suit brought, the plea, rules for taking depositions, and the continuances, while the important and operative facts of Elijah Heath's indebtedness to the United States, his expectation of being sued, and his purpose in conveying his property to Gaskill, to prevent the collection of the debt by the United States, are all proved by the testimony of Gaskill, the witness of both parties. The error, therefore, in admitting the paper was immaterial.

The only ground, alleged in the bill of exception, against the admission of those parts of Charles Gaskill's deposition, read by the plaintiff, was that the declarations proved, were made in the absence of John Heath. But all these portions had relation to the declarations of Elijah Heath to Gaskill, before and at the time of the fraudulent arrangement to transfer his property, to defeat the collection of the claim of the United States. Such declarations are a part of the *res gestæ*, and are not to be likened to declarations made by a grantor after he has parted with his title, to the prejudice of his grantee. There was no error therefore in admitting these declarations: Covanhovan *v.* Hart, *supra*.

The true value of the land was a circumstance bearing on the question of fraud: Hamet *v.* Dundas, 4 Barr 178. Finding no error in the record the judgment is affirmed.